(Slip Opinion)          OCTOBER  TERM,  2005          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KANSAS *v.* MARSH

### CERTIORARI TO THE SUPREME COURT OF KANSAS

No. 04–1170.   Argued December 7, 2005—Reargued April 25, 2006—
Decided June 26, 2006

Finding three aggravating circumstances that were not outweighed by mitigating circumstances, a Kansas jury convicted respondent Marsh of, *inter alia,* capital murder and sentenced him to death.  Marsh claimed on direct appeal that Kan. Stat. Ann. §21–4624(e) establishes an unconstitutional presumption in favor of death by directing imposition of the death penalty when aggravating and mitigating circumstances are in equipoise.  Agreeing, the Kansas Supreme Court concluded that §21–4624(e)'s weighing equation violated the Eighth and Fourteenth Amendments and remanded for a new trial.

*Held:*

   1. This Court has jurisdiction to review the Kansas Supreme Court's judgment under 28 U. S. C. §1257.  That provision authorizes review of a State's final judgment when a state statute's validity is questioned on federal constitutional grounds, and it permits review even when the state-court proceedings are not complete where the federal claim has been finally decided and later review of the federal issue cannot be had, whatever the case's outcome, *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 481.  Although Marsh will be retried, the State Supreme Court's determination that the death penalty statute is unconstitutional is final and binding on the lower state courts.  Thus, the State will be unable to obtain further review of its law in this case.  This Court has deemed lower court decisions final for §1257 purposes in like circumstances, see, *e.g., Florida* v. *Meyers,* 466 U. S. 380 *(per curiam).*  Pp. 3–4.

   2. The State Supreme Court's judgment is not supported by adequate and independent state grounds.  Marsh maintains that the judgment was based on state law, the State Supreme Court having previously reviewed the statute in *State* v. *Kleypas.*  However, *Kley-*

*pas* itself rested on federal law. In this case, the State Supreme Court chastised the *Kleypas* court for avoiding the constitutional issue, squarely found *§*21–4624(e) unconstitutional on its face, and overruled *Kleypas* in relevant part. Pp. 4–5.

   3. Kansas' capital sentencing statute is constitutional. Pp. 5–19.

   (a) *Walton* v. *Arizona,* 497 U. S. 639, requires approval of the Kansas statute. There, the Court held that a state death penalty statute may give the defendant the burden to prove that mitigating circumstances outweigh aggravating circumstances. *A fortiori,* Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the two are in equipoise. Pp. 5–9.

   (b) Even if, as Marsh contends, *Walton* does not directly control here, general principles in this Court's death penalty jurisprudence lead to the same conclusion. So long as a state system satisfies the requirements of *Furman* v. *Georgia,* 408 U. S. 238*,* and *Gregg* v. *Georgia,* 428 U. S. 153—that a system must rationally narrow the class of death-eligible defendants and must permit a jury to render a reasonable, individualized sentencing determination—a State has a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are weighed. The use of mitigation evidence is a product of the individual-sentencing requirement. Defendants have the right to present sentencers with information relevant to the sentencing decision and sentencers are obliged to consider that information in determining the appropriate sentence. The thrust of this Court's mitigation jurisprudence ends here, for the Court has never held that the Constitution requires a specific method for balancing aggravating and mitigating factors. Pp. 9–11.

   (c) Kansas' death penalty statute satisfies the constitutional mandates of *Furman* and its progeny because it rationally narrows the class of death-eligible defendants and permits a jury to consider any mitigating evidence relevant to its sentencing determination. The State's weighing equation merely channels a jury's discretion by providing criteria by which the jury may determine whether life or death is appropriate. Its system provides the kind of guided discretion sanctioned in, *e.g., Walton, supra.* Contrary to Marsh's argument, §21–4624(e) does not create a general presumption in favor of the death penalty. A life sentence must be imposed if the State fails to demonstrate the existence of an aggravating circumstance beyond a reasonable doubt, if the State cannot prove beyond a reasonable doubt that aggravating circumstances are not outweighed by mitigating circumstances, or if the jury is unable to reach a unanimous deci-

Syllabus

sion in any respect. Marsh's contentions that an equipoise determination reflects juror confusion or inability to decide between life and death or that the jury may use equipoise as a loophole to shirk its constitutional duty to render a reasoned, moral sentencing decision rest on an implausible characterization of the Kansas statute—that a jury's determination that aggravators and mitigators are in equipoise is not a *decision,* much less a decision *for death.* Weighing is not an end, but a means to reaching a decision. Kansas' instructions clearly inform the jury that a determination that the evidence is in equipoise is a decision for death. Pp. 11–16.

278 Kan. 520, 102 P. 3d 445, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion. STEVENS, J., filed a dissenting opinion. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 04–1170

### KANSAS, PETITIONER *v.* MICHAEL LEE MARSH, II

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

### [June 26, 2006]

JUSTICE THOMAS delivered the opinion of the Court.

Kansas law provides that if a unanimous jury finds that aggravating circumstances are not outweighed by mitigating circumstances, the death penalty shall be imposed. Kan. Stat. Ann. §21–4624(e) (1995).  We must decide whether this statute, which requires the imposition of the death penalty when the sentencing jury determines that aggravating evidence and mitigating evidence are in equipoise, violates the Constitution.  We hold that it does not.

## I

Respondent Michael Lee Marsh II broke into the home of Marry Ane Pusch and lay in wait for her to return. When Marry Ane entered her home with her 19-month-old daughter, M. P., Marsh repeatedly shot Marry Ane, stabbed her, and slashed her throat.  The home was set on fire with the toddler inside, and M. P. burned to death.

The jury convicted Marsh of the capital murder of M. P., the first-degree premeditated murder of Marry Ane, aggravated arson, and aggravated burglary.  The jury found beyond a reasonable doubt the existence of three aggravating circumstances, and that those circumstances were not outweighed by any mitigating circumstances.  On the

basis of those findings, the jury sentenced Marsh to death for the capital murder of M. P. The jury also sentenced Marsh to life imprisonment without possibility of parole for 40 years for the first-degree murder of Marry Ane, and consecutive sentences of 51 months' imprisonment for aggravated arson and 34 months' imprisonment for aggravated burglary.

On direct appeal, Marsh challenged §21–4624(e), which reads:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K. S. A. 21–4625 . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise the defendant shall be sentenced as provided by law."

Focusing on the phrase "shall be sentenced to death," Marsh argued that §21–4624(e) establishes an unconstitutional presumption in favor of death because it directs imposition of the death penalty when aggravating and mitigating circumstances are in equipoise.

The Kansas Supreme Court agreed, and held that the Kansas death penalty statute, §21–4624(e), is facially unconstitutional. 278 Kan. 520, 534–535, 102 P. 3d 445, 458 (2004). The court concluded that the statute's weighing equation violated the Eighth and Fourteenth Amendments of the United States Constitution because, "[i]n the event of equipoise, *i.e.,* the jury's determination that the balance of any aggravating circumstances and any mitigating circumstances weighed equal, the death penalty would be required." *Id.*, at 534, 102 P. 3d, at 457. The Kansas Supreme Court affirmed Marsh's conviction and sentence for aggravated burglary and premeditated murder of Marry Ane, and reversed and remanded for new

trial Marsh's convictions for capital murder of M. P. and aggravated arson.[1]  We granted certiorari, 544 U. S. 1060 (2005), and now reverse the Kansas Supreme Court's judgment that Kansas' capital sentencing statute, Kan. Stat. Ann. §21–4624(e), is facially unconstitutional.

## II

In addition to granting certiorari to review the constitutionality of Kansas' capital sentencing statute, we also directed the parties to brief and argue: (1) whether we have jurisdiction to review the judgment of the Kansas Supreme Court under 28 U. S. C. §1257, as construed by *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975); and (2) whether the Kansas Supreme Court's judgment is supported by adequate state grounds independent of federal law.  544 U. S. 1060.  Having considered the parties' arguments, we conclude that we have jurisdiction in this case and that the constitutional issue is properly before the Court.

## A

Title 28 U. S. C. §1257 authorizes this Court to review, by writ of certiorari, the final judgment of the highest court of a State when the validity of a state statute is questioned on federal constitutional grounds.  This Court has determined that the foregoing authorization permits review of the judgment of the highest court of a State, even though the state-court proceedings are not yet complete, "where the federal claim has been finally decided, with further proceedings on the merits in the state courts to come, but in which later review of the federal issue

---

[1] The Kansas Supreme Court found that the trial court committed reversible error by excluding circumstantial evidence of third-party guilt connecting Eric Pusch, Marry Ane's husband, to the crimes, and, accordingly ordered a new trial on this ground.  278 Kan., at 528–533, 102 P. 3d, at 454–457.

cannot be had, whatever the ultimate outcome of the case." *Cox Broadcasting, supra*, at 481.

Here, although Marsh will be retried on the capital murder and aggravated arson charges, the Kansas Supreme Court's determination that Kansas' death penalty statute is facially unconstitutional is final and binding on the lower state courts. Thus, the State will be unable to obtain further review of its death penalty law later in this case. If Marsh is acquitted of capital murder, double jeopardy and state law will preclude the State from appealing. If he is reconvicted, the State will be prohibited under the Kansas Supreme Court's decision from seeking the death penalty, and there would be no opportunity for the State to seek further review of that prohibition. Although Marsh argues that a provision of the Kansas criminal appeals statute, Kan. Stat. Ann. §22–3602(b) (2003 Cum. Supp.), would permit the State to appeal the invalidation of Kansas' death penalty statute, that contention is meritless. That statute provides for limited appeal in only four enumerated circumstances, none of which apply here. We have deemed lower court decisions final for 28 U. S. C. §1257 purposes in like circumstances, see *Florida* v. *Meyers*, 466 U. S. 380 (1984) *(per curiam); South Dakota* v. *Neville*, 459 U. S. 553 (1983); *New York* v. *Quarles*, 467 U. S. 649 (1984), and do so again here.

B

Nor is the Kansas Supreme Court's decision supported by adequate and independent state grounds. Marsh maintains that the Kansas Supreme Court's decision was based on the severability of §21–4624(e) under state law, and not the constitutionality of that provision under federal law, the latter issue having been resolved by the Kansas Supreme Court in *State* v. *Kleypas*, 272 Kan. 894, 40 P. 3d 139 (2001). Marsh's argument fails.

*Kleypas*, itself, rested on federal law. See *id.*, at 899–

903, 40 P. 3d, at 166–167. In rendering its determination here, the Kansas Supreme Court observed that *Kleypas*, "held that the weighing equation in K. S. A. 21–4624(e) as written was unconstitutional under the Eighth and Fourteenth Amendments" as applied to cases in which aggravating evidence and mitigating evidence are equally balanced. 278 Kan., at 534, 102 P. 3d, at 457. In this case, the Kansas Supreme Court chastised the *Kleypas* court for avoiding the constitutional issue of the statute's facial validity, squarely held that §21–4624(e) is unconstitutional on its face, and overruled the portion of *Kleypas* upholding the statute through the constitutional avoidance doctrine and judicial revision. 278 Kan., at 534–535, 539–542, 102 P. 3d, at 458, 462. As in *Kleypas*, the Kansas Supreme Court clearly rested its decision here on the Eighth and Fourteenth Amendments to the United States Constitution. We, therefore, have jurisdiction to review its decision. See *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983).

## III

This case is controlled by *Walton* v. *Arizona,* 497 U. S. 639 (1990), overruled on other grounds, *Ring* v. *Arizona,* 536 U. S. 584 (2002). In that case, a jury had convicted Walton of a capital offense. At sentencing, the trial judge found the existence of two aggravating circumstances and that the mitigating circumstances did not call for leniency, and sentenced Walton to death. 497 U. S., at 645. The Arizona Supreme Court affirmed, and this Court granted certiorari to resolve the conflict between the Arizona Supreme Court's decision in *State* v. *Walton*, 159 Ariz. 571, 769 P. 2d 1017 (1989) (en banc) (holding the Arizona death penalty statute constitutional), and the Ninth Circuit's decision in *Adamson* v. *Ricketts*, 865 F. 2d 1011, 1043–1044 (1988) (en banc) (finding the Arizona death penalty statute unconstitutional because, "in situations

where the mitigating and aggravating circumstances are in balance, or, where the mitigating circumstances give the court reservation but still fall below the weight of the aggravating circumstances, the statute bars the court from imposing a sentence less than death"). See *Walton*, 497 U. S*.,* at 647.

Consistent with the Ninth Circuit's conclusion in *Adamson*, Walton argued to this Court that the Arizona capital sentencing system created an unconstitutional presumption in favor of death because it "tells an Arizona sentencing judge who finds even a single aggravating factor, that death must be imposed, unless—as the Arizona Supreme Court put it in Petitioner's case—there are 'outweighing mitigating factors.'" Brief for Petitioner in *Walton* v. *Arizona*, O. T. 1989, No. 88–7351, p. 33; see also *id.,* at 34 (arguing that the statute is unconstitutional because the defendant "'must . . . bear the risk of nonpersuasion that any mitigating circumstance will not outweigh the aggravating circumstance'" (alteration omitted)). Rejecting Walton's argument, see 497 U. S., at 650, 651, this Court stated:

> "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.,* at 650.

This Court noted that, as a requirement of individualized sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation, and that a state statute that permits a jury to consider any mitigating evidence comports with that requirement. *Id*., at 652 (citing *Blystone* v. *Pennsylvania,* 494 U. S. 299, 307 (1990)). The

Court also pointedly observed that while the Constitution requires that a sentencing jury have discretion, it does not mandate that discretion be unfettered; the States are free to determine the manner in which a jury may consider mitigating evidence. 497 U. S., at 652 (citing *Boyde* v. *California,* 494 U. S. 370, 374 (1990)). So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death. 497 U. S., at 652 (citing *Woodson* v. *North Carolina,* 428 U. S. 280 (1976) (plurality opinion), and *Roberts* v. *Louisiana,* 428 U. S. 325 (1976) (plurality opinion)). Indeed, *Walton* suggested that the only capital sentencing systems that would be impermissibly mandatory were those that would "automatically impose death upon conviction for certain types of murder." 497 U. S., at 652.

Contrary to Marsh's contentions and the Kansas Supreme Court's conclusions, see 278 Kan., at 536–538, 102 P. 3d, at 459, the question presented in the instant case was squarely before this Court in *Walton.* Though, as Marsh notes, the *Walton* Court did not employ the term "equipoise," that issue undeniably gave rise to the question this Court sought to resolve, and it was necessarily included in Walton's argument that the Arizona system was unconstitutional because it required the death penalty unless the mitigating circumstances *outweighed* the aggravating circumstances. See *supra*, at 5. Moreover, the dissent in *Walton* reinforces what is evident from the opinion and the judgment of the Court—that the equipoise issue was before the Court, and that the Court resolved the issue in favor of the State. Indeed, the "equipoise" issue was, in large measure, the basis of the *Walton* dissent. See 497 U. S., at 687–688 (opinion of Blackmun, J.) ("If the mitigating and aggravating circumstances are in equipoise, the [Arizona] statute requires that the trial judge impose capital punishment. The assertion that a

sentence of death may be imposed in such a case runs directly counter to the Eighth Amendment requirement that a capital sentence must rest upon a 'determination that death is the appropriate punishment in a specific case'"). Thus, although *Walton* did not discuss the equipoise issue explicitly, that issue was resolved by its holding. Cf. *post*, at 2 (STEVENS, J., dissenting); cf. also *post*, at 2, n. 1 (SOUTER, J., dissenting).

Our conclusion that *Walton* controls here is reinforced by the fact that the Arizona and Kansas statutes are comparable in important respects. Similar to the express language of the Kansas statute, the Arizona statute at issue in *Walton* has been consistently construed to mean that the death penalty will be imposed upon a finding that aggravating circumstances are not outweighed by mitigating circumstances.[2] See *State* v. *Ysea*, 191 Ariz. 372, 375, 956 P. 2d 499, 502 (1998) (en banc); *State* v. *Gretzler*, 135 Ariz. 42, 55, 659 P. 2d 1, 14 (1983) (in banc); *Adamson*, 865 F. 2d, at 1041–1043. Like the Kansas statute, the Arizona statute places the burden of proving the existence of aggravating circumstances on the State, and both statutes require the defendant to proffer mitigating evidence.

The statutes are distinct in one respect. The Arizona statute, once the State has met its burden, tasks the defendant with the burden of proving sufficient mitigating circumstances to overcome the aggravating circumstances and that a sentence less than death is therefore warranted. In contrast, the Kansas statute requires the State

_____

[2] Ariz. Rev. Stat. Ann. §13–703(E) (Supp. 2005) provides:

"In determining whether to impose a sentence of death or life imprisonment, the trier of fact shall take into account the aggravating and mitigating circumstances that have been proven. The trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances enumerated in subsection F of this section and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency."

to bear the burden of proving to the jury, beyond a reasonable doubt, that aggravators are not outweighed by mitigators and that a sentence of death is therefore appropriate; it places no additional evidentiary burden on the capital defendant. This distinction operates in favor of Kansas capital defendants. Otherwise the statutes function in substantially the same manner and are sufficiently analogous for our purposes. Thus, *Walton* is not distinguishable from the instant case.

Accordingly, the reasoning of *Walton* requires approval of the Kansas death penalty statute. At bottom, in *Walton*, the Court held that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances. *A fortiori*, Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise.

## IV

## A

Even if, as Marsh contends, *Walton* does not directly control, the general principles set forth in our death penalty jurisprudence would lead us to conclude that the Kansas capital sentencing system is constitutionally permissible. Together, our decisions in *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam),* and *Gregg* v. *Georgia,* 428 U. S. 153 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), establish that a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime. See *id.,* at 189.

So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed. See *Franklin* v. *Lynaugh,* 487 U. S. 164, 179 (1988) (plurality opinion) (citing *Zant* v. *Stephens,* 462 U. S. 862, 875–876, n. 13 (1983)).

The use of mitigation evidence is a product of the requirement of individualized sentencing. See *Graham* v. *Collins,* 506 U. S. 461, 484–489 (1993) (THOMAS, J., concurring) (discussing the development of mitigation precedent). In *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978), a plurality of this Court held that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original.) The Court has held that the sentencer must have full access to this "'highly relevant'" information. *Id.*, at 603 (alteration omitted) (quoting *Williams* v. *New York*, 337 U. S. 241, 247 (1949)). Thus, in *Lockett*, the Court struck down the Ohio death penalty statute as unconstitutional because, by limiting a jury's consideration of mitigation to three factors specified in the statute, it prevented sentencers in capital cases from giving independent weight to mitigating evidence militating in favor of a sentence other than death. 438 U. S*.,* at 604–605. Following *Lockett*, in *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), a majority of the Court held that a sentencer may not categorically refuse to consider any relevant mitigating evidence. *Id.,* at 114; see also *Skipper* v. *South Carolina,* 476 U. S. 1, 3–4 (1986) (discussing *Eddings*).

In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider

that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin, supra,* at 179 (citing *Zant, supra,* at 875–876, n. 13). Rather, this Court has held that the States enjoy "'a constitutionally permissible range of discretion in imposing the death penalty.'" *Blystone*, 494 U. S., at 308 (quoting *McCleskey* v. *Kemp,* 481 U. S. 279, 305–306 (1987)). See also 494 U. S., at 307 (stating that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"); *Graham*, *supra,* at 490 (THOMAS, J., concurring) (stating that "[o]ur early mitigating cases may thus be read as doing little more than safeguarding the adversary process in sentencing proceedings by conferring on the defendant an affirmative right to place his relevant evidence before the sentencer").

### B

The Kansas death penalty statute satisfies the constitutional mandates of *Furman* and its progeny because it rationally narrows the class of death-eligible defendants and permits a jury to consider any mitigating evidence relevant to its sentencing determination. It does not interfere, in a constitutionally significant way, with a jury's ability to give independent weight to evidence offered in mitigation.

Kansas' procedure narrows the universe of death-eligible defendants consistent with Eighth Amendment requirements. Under Kansas law, imposition of the death penalty is an *option* only after a defendant is convicted of capital murder, which requires that one or more specific elements beyond intentional premeditated murder be found. See Kan. Stat. Ann. §21–3439. Once convicted of

capital murder, a defendant becomes *eligible* for the death penalty only if the State seeks a separate sentencing hearing, §§21–4706(c) (2003 Cum. Supp.), 21–4624(a); App. 23 (Instruction No. 2), and proves beyond a reasonable doubt the existence of one or more statutorily enumerated aggravating circumstances. Kan. Stat. Ann. §§21–4624(c), (e), and 21–4625; App. 24 (Instruction No. 3).

Consonant with the individualized sentencing requirement, a Kansas jury is permitted to consider *any* evidence relating to *any* mitigating circumstance in determining the appropriate sentence for a capital defendant, so long as that evidence is relevant. §21–4624(c). Specifically, jurors are instructed:

> "A mitigating circumstance is that which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, although it does not justify or excuse the offense. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.
>
> "The appropriateness of the exercise of mercy can itself be a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted." *Id.,* at 24 (Instruction No. 4).[3]

Jurors are then apprised of, but not limited to, the factors that the defendant contends are mitigating. *Id*., at 25–26. They are then instructed that "[e]ach juror must consider every mitigating factor that he or she individually finds to

---

[3] The "mercy" jury instruction alone forecloses the possibility of *Furman*-type error as it "eliminate[s] the risk that a death sentence will be imposed in spite of facts calling for a lesser penalty." *Post,* at 4 (SOUTER, J., dissenting).

exist." *Id.*, at 26.

Kansas' weighing equation, *ibid.* (Instruction No. 5), merely channels a jury's discretion by providing it with criteria by which it may determine whether a sentence of life or death is appropriate. The system in Kansas provides the type of "'guided discretion,'" *Walton*, 497 U. S., at 659 (citing *Gregg*, 428 U. S., at 189), we have sanctioned in *Walton*, *Boyde,* and *Blystone*.

Indeed, in *Boyde*, this Court sanctioned a weighing jury instruction that is analytically indistinguishable from the Kansas jury instruction under review today. The *Boyde* jury instruction read:

> "'If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you *shall impose* a sentence of confinement in the state prison for life without the possibility of parole.'" 494 U. S., at 374 (emphasis in original).

Boyde argued that the mandatory language of the instruction prevented the jury from rendering an individualized sentencing determination. This Court rejected that argument, concluding that it was foreclosed by *Blystone*, where the Court rejected a nearly identical challenge to the Pennsylvania death penalty statute. 494 U. S., at 307.[4] In so holding, this Court noted that the mandatory language of the statute did not prevent the jury from *considering* all relevant mitigating evidence. *Boyde,* 494 U. S., at 374. Similarly here, §21–4624(e) does not prevent a

———————

[4] In *Blystone,* the Pennsylvania statute authorized imposition of a death sentence if the jury concluded "that the aggravating circumstances outweigh[ed] the mitigating circumstances present in the particular crime committed by the particular defendant, or that there [were] no such mitigating circumstances." 494 U. S., at 305.

Kansas jury from considering mitigating evidence. Marsh's argument that the Kansas provision is impermissibly mandatory is likewise foreclosed.[5]

Contrary to Marsh's argument, §21–4624(e) does not create a general presumption in favor of the death penalty in the State of Kansas. Rather, the Kansas capital sentencing system is dominated by the presumption that life imprisonment is the appropriate sentence for a capital conviction. If the State fails to meet its burden to demonstrate the existence of an aggravating circumstance(s) beyond a reasonable doubt, a sentence of life imprisonment must be imposed. §21–4624(e); App. 27 (Instruction No. 10). If the State overcomes this hurdle, then it bears the additional burden of proving beyond a reasonable doubt that aggravating circumstances are not outweighed by mitigating circumstances. *Ibid.* (Instruction No. 10); *id.*, at 26 (Instruction No. 5). Significantly, although the defendant appropriately bears the burden of proffering mitigating circumstances—a burden of production—he never bears the burden of demonstrating that mitigating circumstances outweigh aggravating circumstances.

––––––––

[5] Contrary to JUSTICE SOUTER's assertion, the Court's decisions in *Boyde* and *Blystone* did not turn on the "predominance of the aggravators" in those cases. *Post,* at 3 (dissenting opinion.). Rather, those decisions plainly turned on the fact that the mandatory language of the respective statutes did not prevent the sentencing jury from "consider[ing] and giv[ing] effect to all relevant mitigating evidence." *Blystone, supra*, at 305. See also *Boyde,* 494 U. S., at 377 ("[T]he legal principle we expounded in *Blystone* clearly requires rejection of Boyde's claim as well, because the mandatory language of [California jury instruction] 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence"). The language of the Kansas statute at issue here no more "dictate[s] death," *post*, at 3, than the mandatory language at issue in *Boyde* and *Blystone*. See *Blystone*, *supra*, at 305 (explaining that the Pennsylvania statute is not "'mandatory' as that term was understood in *Woodson* [v. *North Carolina,* 428 U. S. 280 (1976)] or *Roberts* [v. *Louisiana,* 428 U. S. 325 (1976)]" because "[d]eath is not automatically imposed upon conviction for certain types of murder").

Instead, the State always has the burden of demonstrating that mitigating evidence does not outweigh aggravating evidence. Absent the State's ability to meet that burden, the default is life imprisonment. Moreover, if the jury is unable to reach a unanimous decision—in any respect—a sentence of life must be imposed. §21–4624(c); App. 28 (Instruction No. 12). This system does not create a presumption that death is the appropriate sentence for capital murder.[6]

Nor is there any force behind Marsh's contention that an equipoise determination reflects juror confusion or inability to decide between life and death, or that a jury may use equipoise as a loophole to shirk its constitutional duty to render a reasoned, moral decision, see *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'Connor, J., concurring), regarding whether death is an appropriate sentence for a particular defendant. Such an argument rests on an implausible characterization of the Kansas statute—that a jury's determination that aggravators and mitigators are in equipoise is not a *decision*, much less a decision *for death*—and thus misses the mark. Cf. *post*, at 4–5 (SOUTER, J., dissenting) (arguing that Kansas' weighing equation undermines individualized sentencing). Weighing is not an end; it is merely a means to reaching a decision. The decision the jury must reach is whether life or death is the appropriate punishment. The Kansas jury instructions clearly inform the jury that a determination that the evidence is in equipoise is a decision for—not a

——————

[6] Additionally, Marsh's argument turns on reading §21–4624(e) in isolation. Such a reading, however, is contrary to "'the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Boyde* v. *California*, 494 U. S. 370, 378 (1990) (citing *Boyd* v. *United States*, 271 U. S. 104, 107 (1926)). The constitutionality of a State's death penalty system turns on review of that system in context. We thus reject his disengaged interpretation of §21–4624(e).

presumption in favor of—death.  Kansas jurors, presumed
to follow their instructions, are made aware that: a deter-
mination that mitigators outweigh aggravators is a deci-
sion that a life sentence is appropriate; a determination
that aggravators outweigh mitigators *or* a determination
that mitigators do not outweigh aggravators—including a
finding that aggravators and mitigators are in balance—is
a decision that death is the appropriate sentence; and an
inability to reach a unanimous decision will result in a
sentence of life imprisonment.  So informed, far from the
abdication of duty or the inability to select an appropriate
sentence depicted by Marsh and JUSTICE SOUTER, a jury's
conclusion that aggravating evidence and mitigating
evidence are in equipoise is a *decision for death* and is
indicative of the type of measured, normative process in
which a jury is constitutionally tasked to engage when
deciding the appropriate sentence for a capital defendant.

## V

JUSTICE SOUTER argues (hereinafter the dissent) that
the advent of DNA testing has resulted in the "exonera-
tio[n]" of "innocent" persons "in numbers never imagined
before the development of DNA tests."  *Post*, at 5–6.
Based upon this "new empirical demonstration of how
'death is different,'" *post*, at 8, the dissent concludes that
Kansas' sentencing system permits the imposition of the
death penalty in the absence of reasoned moral judgment.

But the availability of DNA testing, and the questions it
might raise about the accuracy of guilt-phase determina-
tions in capital cases, is simply irrelevant to the question
before the Court today, namely, the constitutionality of
Kansas' capital *sentencing* system.  Accordingly, the accu-
racy of the dissent's factual claim that DNA testing has
established the "innocence" of numerous convicted persons
under death sentences—and the incendiary debate it

invokes—is beyond the scope of this opinion.[7]

The dissent's general criticisms against the death penalty are ultimately a call for resolving all legal disputes in capital cases by adopting the outcome that makes the death penalty more difficult to impose. While such a bright-line rule may be easily applied, it has no basis in law. Indeed, the logical consequence of the dissent's argument is that the death penalty can only be just in a system that does not permit error. Because the criminal justice system does not operate perfectly, abolition of the death penalty is the only answer to the moral dilemma the dissent poses. This Court, however, does not sit as a moral authority. Our precedents do not prohibit the States from authorizing the death penalty, even in our imperfect system. And those precedents do not empower this Court to chip away at the States' prerogatives to do so on the grounds the dissent invokes today.

\*    \*    \*

We hold that the Kansas capital sentencing system, which directs imposition of the death penalty when a jury finds that aggravating and mitigating circumstances are

_____

[7] But see The Penalty of Death, in Debating the Death Penalty: Should America Have Capital Punishment? The Experts on Both Sides Make Their Best Case, 117, 127–132, 134, (H. Bedau & P. Cassell eds. 2004). See also Comment, Protecting the Innocent: A Response to the Bedau-Radelet Study, 41 Stan. L. Rev. 121, 126–145 (1988) (examining accuracy in use of the term "innocent" in death penalty studies and literature); Marquis, The Myth of Innocence, 95 J. Crim. L. & C. 501, 508 (2005) ( "[w]ords like 'innocence' convey enormous moral authority and are intended to drive the public debate by appealing to a deep and universal revulsion at the idea that someone who is genuinely blameless could wrongly suffer for a crime in which he had no involvement"); *People* v. *Smith*, 185 Ill. 2d 532, 545, 708 N. E. 2d 365, 371 (1999) ("[w]hile a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. . . . Rather, [a reversal of conviction] indicates simply that the prosecution has failed to meet its burden of proof").

in equipoise, is constitutional. Accordingly, we reverse the judgment of the Kansas Supreme Court, and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 04–1170

KANSAS, PETITIONER *v.* MICHAEL LEE MARSH, II

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[June 26, 2006]

JUSTICE SCALIA, concurring.

I join the opinion of the Court. I write separately to clarify briefly the import of my joinder, and to respond at somewhat greater length first to JUSTICE STEVENS' contention that this case, and cases like it, do not merit our attention, and second to JUSTICE SOUTER's claims about risks inherent in capital punishment.

I

Part III of the Court's opinion—which makes plain why *Walton* v. *Arizona,* 497 U. S. 639 (1990), controls this case—would be sufficient to reverse the judgment below. I nonetheless join Part IV as well, which describes why Kansas's death penalty statute easily satisfies even a capital jurisprudence as incoherent as ours has become. In doing so, I do not endorse that incoherence, but adhere to my previous statement that "I will not . . . vote to uphold an Eighth Amendment claim that the sentencer's discretion has been unlawfully restricted." *Id.,* at 673 (concurring in part and concurring in judgment).

II

JUSTICE STEVENS' dissent gives several reasons why this case, and any criminal case in which the State is the petitioner, does not deserve our attention. "'[N]o rule of law,'" he says, "'commanded the Court to grant certiorari.'" *Post,* at 3 (quoting *California* v. *Ramos,* 463 U. S.

992, 1031 (1983) (STEVENS, J., dissenting)). But that is
true, of course, of almost our entire docket; it is in the very
nature of certiorari jurisdiction. Also self-evident, since
the jurisdiction of the Kansas Supreme Court ends at the
borders of that State, is the fact that "'[n]o other State
would have been required to follow the [Kansas] precedent
if it had been permitted to stand.'" *Post*, at 3 (STEVENS, J.,
dissenting) (quoting *Ramos*, *supra*, at 1031 (STEVENS, J.,
dissenting)). But if this signaled the impropriety of grant-
ing certiorari, we would never review state-court determi-
nations of federal law, even though they patently contra-
dict (as the determination below does) the holdings of
other state courts and Federal Courts of Appeals, compare
278 Kan. 520, 534–537, 102 P. 3d 445, 457–459 (2004)
(case below), and *State* v. *Kleypas*, 272 Kan. 894, 1005–
1007, 40 P. 3d 139, 225–226 (2001), with, *e.g.*, *State* v.
*Hoffman*, 123 Idaho 638, 646–647, 851 P. 2d 934, 942–943
(1993), and *Jones* v. *Dugger*, 928 F. 2d 1020, 1029 (CA11
1991)—and indeed, even when they patently contradict
our own decisions. Our principal responsibility under
current practice, however, and a primary basis for the
Constitution's allowing us to be accorded jurisdiction to
review state-court decisions, see Art. III, §2, cls. 1 and 2, is
to ensure the integrity and uniformity of federal law.[1] See

———————

[1] The dissent observes that Congress did not initially grant us the full
jurisdiction that the Constitution authorizes, but only allowed us to
review cases *rejecting* the assertion of governing federal law. See *post*,
at 3–4, n. (opinion of STEVENS, J.). That is unsurprising and immate-
rial. The original Constitution contained few guarantees of individual
rights against the States, and in clashes of governmental authority
there was small risk that the state courts would erroneously side with
the new Federal Government. (In 1789, when the first Judiciary Act
was passed, the Bill of Rights had not yet been adopted, and once it
was, it did not apply against the States, see *Barron ex rel. Tiernan* v.
*Mayor of Baltimore,* 7 Pet. 243 (1833).) Congress would have been most
unlikely to contemplate that state courts would erroneously invalidate
state actions on federal grounds. The early history of our jurisdiction

this Court's Rule 10(b), (c). Fulfillment of this responsibility is, to put it mildly, an adequate answer to the charge that "'[n]othing more than an interest in facilitating the imposition of the death penalty in [Kansas] justified this Court's exercise of its discretion to review the judgment of the [Kansas] Supreme Court.'" *Post*, at 3 (STEVENS, J., dissenting) (quoting *Ramos, supra*, at 1031 (STEVENS, J., dissenting)).

The dissent's assertion that our holding in *Ramos* was "ironi[c]," *post*, at 2 (opinion of STEVENS, J.), rests on a misguided view of federalism and, worse still, of a republican form of government. Only that can explain the dissent's suggestion that *Ramos*'s reversal of a state-court determination somehow undermined state authority. The California Supreme Court had ruled that a jury instruction inserted into the state penal code by voter initiative, see 463 U. S., at 995, n. 4, was invalid *as a matter of federal constitutional law*. See *id.*, at 996, 997, n. 7. When state courts erroneously invalidate actions taken by the people of a State (through initiative or through normal operation of the political branches of their state government) on *state-law* grounds, it is generally none of our business; and our displacing of those judgments would indeed be an intrusion upon state autonomy. But when state courts erroneously invalidate such actions because

---

assuredly does not support the dissent's awarding of special preference to the constitutional rights of criminal defendants. Even with respect to *federal* defendants (who *did* enjoy the protections of the Bill of Rights), "during the first 100 years of the Court's existence there was no provision made by Congress for Supreme Court review of federal criminal convictions, an omission that Congress did not remedy until 1889 and beyond." R. Stern, E. Gressman, S. Shapiro, & K. Geller, Supreme Court Practice 66 (8th ed. 2002). In any case, *present* law is plain. The 1988 statute cited by the dissent and forming the basis of our current certiorari jurisdiction places States and defendants in precisely the same position. They are both entitled to petition for our review.

they believe federal law requires it—and *especially* when they do so because they believe the Federal *Constitution* requires it—review by this Court, far from *undermining* state autonomy, is the only possible way to *vindicate* it. When a federal constitutional interdict against the duly expressed will of the people of a State is erroneously pronounced by a State's highest court, no authority in the State—not even a referendum agreed to by all its citizens—can undo the error. Thus, a general presumption against such review displays not respect for the States, but a complacent willingness to allow judges to strip the people of the power to govern themselves. When we correct a state court's federal errors, *we return power to the State, and to its people.*

That is why our decision in *Ramos* was necessary. Our solemn responsibility is not merely to determine whether a State Supreme Court "ha[s] adequately protected [a defendant's] rights under the Federal Constitution," *post*, at 2 (STEVENS, J., dissenting). It is to ensure that when courts speak in the name of the Federal Constitution, they disregard none of its guarantees—neither those that assure the rights of criminal defendants, nor those that assure what Justice Black, in his famous dissent in *In re Winship,* 397 U. S. 358, 385 (1970), called "the most fundamental individual liberty of our people—the right of each man to participate in the self-government of his society." Turning a blind eye to federal constitutional error that benefits criminal defendants, allowing it to permeate in varying fashion each state Supreme Court's jurisprudence, would change the uniform "law of the land" into a crazy quilt. And on top of it all, of course, what the dissent proposes avowedly favors one party to the case: When a criminal defendant loses a questionable constitutional point, we may grant review; when the State loses, we must deny it. While it might be appropriate for Congress to place such a thumb upon the scales of our power

to review, it seems to me a peculiar mode of decisionmaking for judges sworn to "impartially discharge . . . all the duties" of their office, 28 U. S. C. §453.

Our decision to grant certiorari is guided by the considerations set forth in Rule 10. None of them turns on the identity of the party that the asserted misapplication of federal law has harmed. When state legislation is thwarted—not on the basis of state law, but on the basis of a questionable application of the Federal Constitution or laws—I shall continue to vote to grant the resulting petition for certiorari.

## III

Finally, I must say a few words (indeed, more than a few) in response to Part III of JUSTICE SOUTER's dissent. This contains the disclaimer that the dissenters are not (*yet*) ready to "generaliz[e] about the soundness of capital sentencing across the country," *post*, at 9; but that is in fact precisely what they do. The dissent essentially argues that capital punishment is such an undesirable institution—it results in the condemnation of such a large number of innocents—that any legal rule which eliminates its pronouncement, including the one favored by the dissenters in the present case, should be embraced. See *ibid*.

As a general rule, I do not think it appropriate for judges to heap either praise or censure upon a legislative measure that comes before them, lest it be thought that their validation, invalidation, or interpretation of it is driven by their desire to expand or constrict what they personally approve or disapprove as a matter of policy. In the present case, for example, people might leap to the conclusion that the dissenters' views on whether Kansas's equipoise rule is constitutional are determined by their personal disapproval of an institution that has been democratically adopted by 38 States and the United States. But of course that requires no leap; just a willingness to

take the dissenters at their word. For as I have described, the dissenters' very argument is that imposition of the death penalty should be minimized by invalidation of the equipoise rule because it is a bad, "risk[y]," and "hazard[ous]" idea, *ibid*. A broader conclusion that people should derive, however (and I would not consider this much of a leap either), is that the dissenters' encumbering of the death penalty in *other* cases, with unwarranted restrictions neither contained in the text of the Constitution nor reflected in two centuries of practice under it, will be the product of their policy views—views not shared by the vast majority of the American people. The dissenters' proclamation of their policy agenda in the present case is especially striking because it is nailed to the door of the wrong church—that is, set forth in a case litigating a rule that has nothing to do with the evaluation of guilt or innocence. There are, of course, many cases in which the rule at issue *does* serve that function, see, *e.g.*, *House* v. *Bell,* 547 U. S. ___ (2006). (Marsh himself has earned a remand by application of one such rule, see *ante*, at 2–3.) But as the Court observes, see *ante*, at 16–17, guilt or innocence is logically disconnected to the challenge in *this* case to *sentencing* standards. The *only* time the equipoise provision is relevant is when the State has proved a defendant guilty of a capital crime.[2]

——————

[2] Not only are the dissent's views on the erroneous imposition of the death penalty irrelevant to the present case, but the dissent's proposed holding on the equipoise issue will not necessarily work to defendants' advantage. The equipoise provision of the Kansas statute imposes the death penalty only when the State proves *beyond a reasonable doubt* that mitigating factors do not outweigh the aggravators. See *ante*, at 2. If we were to disallow Kansas's scheme, the State could, as Marsh freely admits, replace it with a scheme requiring the State to prove *by a mere preponderance of the evidence* that the aggravators outweigh the mitigators. See Tr. of Oral Rearg. 36. I doubt that any defense counsel would accept this trade. The "preponderance" rule, while it sounds better, would almost surely produce more death sentences than an

There exists in some parts of the world sanctimonious criticism of America's death penalty, as somehow unworthy of a civilized society. (I say sanctimonious, because most of the countries to which these finger-waggers belong had the death penalty themselves until recently—and indeed, many of them would still have it if the democratic will prevailed.[3]) It is a certainty that the opinion of a near-majority of the United States Supreme Court to the effect that our system condemns many innocent defendants to death will be trumpeted abroad as vindication of these criticisms. For that reason, I take the trouble to point out that the dissenting opinion has nothing substantial to support it.

It should be noted at the outset that the dissent does not discuss a single case—not one—in which it is clear that a person was executed for a crime he did not commit. If such an event had occurred in recent years, we would not

---

"equipoise beyond a reasonable doubt" requirement.

[3] It is commonly recognized that "[m]any European countries . . . abolished the death penalty in spite of public opinion rather than because of it." Bibas, Transparency and Participation in Criminal Procedure, 81 N. Y. U. L. Rev. 911, 931–932 (2006). See also *id.*, at 932, n. 88. Abolishing the death penalty has been made a condition of joining the Council of Europe, which is in turn a condition of obtaining the economic benefits of joining the European Union. See Waters, Mediating Norms and Identity: The Role of Transnational Judicial Dialogue in Creating and Enforcing International Law, 93 Geo. L. J. 487, 525 (2005); Demleitner, Is There a Future for Leniency in the U. S. Criminal Justice System? 103 Mich. L. Rev. 1231, 1256, and n. 88 (2005). The European Union advocates against the death-penalty even *in America;* there is a separate death-penalty page on the website of the Delegation of the European Commission to the U. S. A. See http://www.eurunion.org/legislat/deathpenalty/deathpenhome.htm (as visited June 17, 2006, and available in Clerk of Court's case file). The views of the European Union have been relied upon by Justices of this Court (including all four dissenters today) in narrowing the power of the American people to impose capital punishment. See, *e.g.*, *Atkins* v. *Virginia,* 536 U. S. 304, 317, n. 21 (2002) (citing, for the views of "the world community," the Brief for the European Union as *Amicus Curiae*).

have to hunt for it; the innocent's name would be shouted
from the rooftops by the abolition lobby. The dissent
makes much of the new-found capacity of DNA testing to
establish innocence. But in every case of an executed
defendant of which I am aware, that technology has *con-
firmed* guilt.

This happened, for instance, only a few months ago in
the case of Roger Coleman. Coleman was convicted of the
gruesome rape and murder of his sister-in-law, but he
persuaded many that he was actually innocent and be-
came the poster-child for the abolitionist lobby. See Glod
& Shear, DNA Tests Confirm Guilt of Man Executed by
Va., Washington Post, Jan. 13, 2006, p. A1; Dao, DNA Ties
Man Executed in '92 to the Murder He Denied, N. Y.
Times, Jan. 13, 2006, p. A14. Around the time of his
eventual execution, "his picture was on the cover of Time
magazine ('This Man Might Be Innocent. This Man Is Due
to Die'). He was interviewed from death row on 'Larry
King Live,' the 'Today' show, 'Primetime Live,' 'Good
Morning America' and 'The Phil Donahue Show.'"
Frankel, Burden of Proof, Washington Post, May 14, 2006,
pp. W8, W11. Even one Justice of this Court, in an opin-
ion filed shortly before the execution, cautioned that
"Coleman has now produced substantial evidence that he
may be innocent of the crime for which he was sentenced
to die." *Coleman* v. *Thompson,* 504 U. S. 188, 189 (1992)
(Blackmun, J., dissenting). Coleman ultimately failed a
lie-detector test offered by the Governor of Virginia as a
condition of a possible stay; he was executed on May 20,
1992. Frankel, *supra*, at W23; Glod & Shear, Warner
Orders DNA Testing in Case of Man Executed in '92,
Washington Post, Jan. 6, 2006, pp. A1, A6.

In the years since then, Coleman's case became a rally-
ing point for abolitionists, who hoped it would offer what
they consider the "Holy Grail: proof from a test tube that
an innocent person had been executed." Frankel, *supra*, at

W24. But earlier this year, a DNA test ordered by a later Governor of Virginia proved that Coleman was guilty, see, *e.g.*, Glod & Shear, DNA Tests Confirm Guilt of Man Executed by Va., *supra*, at A1; Dao, *supra*, at A14, even though his defense team had "proved" his innocence and had even identified "the real killer" (with whom they eventually settled a defamation suit). See Frankel, *supra,* at W23. And Coleman's case is not unique. See Truth and Consequences: The Penalty of Death, in Debating the Death Penalty: Should America Have Capital Punishment? The Experts on Both Sides Make Their Best Case, 128–129 (H. Bedau & P. Cassell eds. 2004) (discussing the cases of supposed innocents Rick McGinn and Derek Barnabei, whose guilt was also confirmed by DNA tests).

Instead of identifying and discussing any particular case or cases of mistaken execution, the dissent simply cites a handful of studies that bemoan the alleged prevalence of wrongful death sentences. One study (by Lanier and Acker) is quoted by the dissent as claiming that "'more than 110' death row prisoners have been released since 1973 upon findings that they were innocent of the crimes charged, and 'hundreds of additional wrongful convictions in potentially capital cases have been documented over the past century.'" *Post*, at 8 (opinion of SOUTER, J.). For the first point, Lanier and Acker cite the work of the Death Penalty Information Center (more about that below) and an article in a law review jointly authored by Radelet, Lofquist, and Bedau (two professors of sociology and a professor of philosophy). For the second point, they cite only a 1987 article by Bedau and Radelet. See Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21. In the very same paragraph which the dissent quotes, Lanier and Acker also refer to that 1987 article as "hav[ing] identified 23 individuals who, in their judgment, were convicted and executed in this country during the 20th century notwithstanding their innocence." Lanier &

Acker, Capital Punishment, the Moratorium Movement, and Empirical Questions, 10 Psychology, Public Policy & Law 577, 593 (2004). This 1987 article has been highly influential in the abolitionist world. Hundreds of academic articles, including those relied on by today's dissent, have cited it. It also makes its appearance in judicial decisions—cited recently in a six-judge dissent in *House* v. *Bell*, 386 F. 3d 668, 708 (CA6 2004) (en banc) (Merritt, J., dissenting), for the proposition that "the system is allowing some innocent defendants to be executed." The article therefore warrants some further observations.

The 1987 article's obsolescence began at the moment of publication. The most recent executions it considered were in 1984, 1964, and 1951; the rest predate the Allied victory in World War II. (Two of the supposed innocents are Sacco and Vanzetti.) Bedau & Radelet, *supra*, at 73. Even if the innocence claims made in this study were true, all except (perhaps) the 1984 example would cast no light upon the functioning of our current system of capital adjudication. The legal community's general attitude toward criminal defendants, the legal protections States afford, the constitutional guarantees this Court enforces, and the scope of federal habeas review, are all vastly different from what they were in 1961. So are the scientific means of establishing guilt, and hence innocence— which are now so striking in their operation and effect that they are the subject of more than one popular TV series. (One of these new means, of course, is DNA testing—which the dissent seems to think is primarily a way to identify defendants erroneously convicted, rather than a highly effective way to avoid conviction of the innocent.)

But their current relevance aside, this study's conclusions are unverified. And if the support for its most significant conclusion—the execution of 23 innocents in the 20th century—is any indication of its accuracy, neither it, nor any study so careless as to rely upon it, is worthy of

credence. The only execution of an innocent man it alleges to have occurred after the restoration of the death penalty in 1976—the Florida execution of James Adams in 1984—is the easiest case to verify. As evidence of Adams' innocence, it describes a hair that could not have been his as being "clutched in the victim's hand," Bedau & Radelet, *supra*, at 91. The hair was *not* in the victim's hand; "[i]t was a remnant of a sweeping of the ambulance and so could have come from another source." Markman & Cassell, Protecting the Innocent: A Response to the Bedau-Radelet Study, 41 Stan. L. Rev. 121, 131 (1988). The study also claims that a witness who "heard a voice inside the victim's home at the time of the crime" testified that the "voice was a woman's," Bedau & Radelet, *supra*, at 91. The witness's actual testimony was that the voice, which said "'"In the name of God, don't do it"'" (and was hence unlikely to have been the voice of anyone but the male victim), "'sounded "kind of like a woman's voice, kind of like strangling or something . . . ."'" Markman & Cassell, Protecting the Innocent, at 130. Bedau and Radelet failed to mention that upon arrest on the afternoon of the murder Adams was found with some $200 in his pocket—one bill of which "was stained with type O blood. When Adams was asked about the blood on the money, he said that it came from a cut on his finger. His blood was type AB, however, while the victim's was type O." *Id.*, at 132. Among the other unmentioned, incriminating details: that the victim's *eyeglasses* were found in Adams' car, along with jewelry belonging to the victim, and clothing of Adams' stained with type O blood. *Ibid.* This is just a sample of the evidence arrayed against this "innocent." See *id.*, at 128–133, 148–150.

Critics have questioned the study's findings with regard to all its other cases of execution of alleged innocents for which "appellate opinions . . . set forth the facts proved at trial in detail sufficient to permit a neutral observer to

assess the validity of the authors' conclusions."  *Id.*, at
134.  (For the rest, there was not "a reasonably complete
account of the facts . . . readily available," *id.*, at 145.)  As
to those cases, the only readily verifiable ones, the authors
of the 1987 study later acknowledged, "We agree with our
critics that we have not 'proved' these executed defendants
to be innocent; we never claimed that we had."  Bedau &
Radelet, The Myth of Infallibility: A Reply to Markman
and Cassell, 41 Stan. L. Rev. 161, 164 (1988).  One would
have hoped that this disclaimer of the study's most strik-
ing conclusion, if not the study's dubious methodology,
would have prevented it from being cited as authority in
the pages of the United States Reports.  But alas, it is too
late for that.  Although today's dissent relies on the study
only indirectly, the two dissenters who were on the Court
in January 1993 have already embraced it.  "One impres-
sive study," they noted (referring to the 1987 study), "has
concluded that 23 innocent people have been executed in
the United States in this century, including one as re-
cently as 1984."  *Herrera* v. *Collins,* 506 U. S. 390, 430, n. 1
(1993) (Blackmun, J., joined by STEVENS and SOUTER, JJ.,
dissenting).[4]

Remarkably avoiding any claim of erroneous executions,
the dissent focuses on the large numbers of *non*-executed
"exonerees" paraded by various professors.  It speaks as
though exoneration came about through the operation of
some outside force to correct the mistakes of our legal
system, rather than *as a consequence of the functioning of
our legal system.*  Reversal of an erroneous conviction on
appeal or on habeas, or the pardoning of an innocent

———————

[4] See also *Callins* v. *Collins*, 510 U. S. 1141, 1158, n. 8 (1994) (Black-
mun, J., dissenting from denial of certiorari) ("Innocent persons *have*
been executed, see Bedau & Radelet, Miscarriages of Justice in Poten-
tially Capital Cases, 40 Stan. L. Rev. 21, 36, 173–179 (1987), perhaps
recently, see *Herrera* v. *Collins,* 506 U. S. 390 (1993), and will continue to
be executed under our death penalty scheme").

condemnee through executive clemency, demonstrates not the failure of the system but its success. Those devices are part and parcel of the multiple assurances that are applied before a death sentence is carried out.

Of course even in identifying exonerees, the dissent is willing to accept anybody's say-so. It engages in no critical review, but merely parrots articles or reports that support its attack on the American criminal justice system. The dissent places significant weight, for instance, on the Illinois Report (compiled by the appointees of an Illinois Governor who had declared a moratorium upon the death penalty and who eventually commuted all death sentences in the State, see Warden, Illinois Death Penalty Reform: How It Happened, What It Promises, 95 J. Crim. L. & C. 381, 406–407, 410 (2006)), which it claims shows that "false verdicts" are "remarkable in number." *Post,* at 9 (opinion of SOUTER, J.). The dissent claims that this Report identifies 13 inmates released from death row after they were determined to be innocent. To take one of these cases, discussed by the dissent as an example of a judgment "as close to innocence as any judgments courts normally render," *post,* at 7, n. 2: In *People* v. *Smith*, 185 Ill. 2d 532, 708 N. E. 2d 365 (1999) the defendant was twice convicted of murder. After his first trial, the Supreme Court of Illinois "reversed [his] conviction based upon certain evidentiary errors" and remanded his case for a new trial. *Id.*, at 534, 708 N. E. 2d, at 366. The second jury convicted Smith again. The Supreme Court of Illinois again reversed the conviction because it found that the evidence was insufficient to establish guilt beyond a reasonable doubt. *Id.*, at 542–543, 708 N. E. 2d, at 370–371. The court explained:

> "While a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. Courts do not find people guilty or innocent. . . . A not

guilty verdict expresses no view as to a defendant's innocence. Rather, [a reversal of conviction] indicates simply that the prosecution has failed to meet its burden of proof." *Id.*, at 545, 708 N. E. 2d, at 371.

This case alone suffices to refute the dissent's claim that the Illinois Report distinguishes between "exoneration of a convict because of actual innocence, and reversal of a judgment because of legal error affecting conviction or sentence but not inconsistent with guilt in fact," *post,* at 7, n. 2. The broader point, however, is that it is utterly impossible to regard "exoneration"—however casually defined—as a failure of the capital justice system, rather than as a vindication of its effectiveness in releasing not only defendants who are innocent, but those whose guilt has not been established beyond a reasonable doubt.

Another of the dissent's leading authorities on exoneration of the innocent is Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J. Crim. L. & C. 523 (2006) (hereinafter Gross). The dissent quotes that study's self-congratulatory "criteria" of exoneration—seemingly so rigorous that no one could doubt the study's reliability. See *post*, at 8, n. 3 (opinion of SOUTER, J.). But in fact that article, like the others cited, is notable not for its rigorous investigation and analysis, but for the fervor of its belief that the American justice system is condemning the innocent "in numbers," as the dissent puts it, "never imagined before the development of DNA tests." *Post*, at 6 (opinion of SOUTER, J.). Among the article's list of 74 "exonerees," Gross 529, is Jay Smith of Pennsylvania. Smith—a school principal—earned three death sentences for slaying one of his teachers and her two young children. See *Smith* v. *Holtz*, 210 F. 3d 186, 188 (CA3 2000). His retrial for triple murder was barred on double jeopardy grounds because of prosecutorial misconduct during the first trial. *Id.*, at 194.

But Smith could not leave well enough alone. He had the gall to sue, under 42 U. S. C. §1983, for false imprisonment. The Court of Appeals for the Third Circuit affirmed the jury verdict for the defendants, observing along the way that "our confidence in Smith's convictions is not diminished in the least. We remain firmly convinced of the integrity of those guilty verdicts." 210 F. 3d, at 198.

Another "exonerated" murderer in the Gross study is Jeremy Sheets, convicted in Nebraska. His accomplice in the rape and murder of a girl had been secretly tape recorded; he "admitted that he drove the car used in the murder . . . , and implicated Sheets in the murder." *Sheets* v. *Butera*, 389 F. 3d 772, 775 (CA8 2004). The accomplice was arrested and eventually described the murder in greater detail, after which a plea agreement was arranged, conditioned on the accomplice's full cooperation. *Ibid.* The resulting taped confession, which implicated Sheets, was "[t]he crucial portion of the State's case," *State* v. *Sheets*, 260 Neb. 325, 327, 618 N. W. 2d 117, 122 (2000). But the accomplice committed suicide in jail, depriving Sheets of the opportunity to cross-examine him. This, the Nebraska Supreme Court held, rendered the evidence inadmissible under the Sixth Amendment. *Id.*, at 328, 335–351, 618 N. W. 2d, at 123, 127–136. After the central evidence was excluded, the State did not retry Sheets. *Sheets* v. *Butera*, 389 F. 3d, at 776. Sheets brought a §1983 claim; the U. S. Court of Appeals for the Eighth Circuit affirmed the District Court's grant of summary judgment against him. *Id.*, at 780. Sheets also sought the $1,000 he had been required to pay to the Nebraska Victim's Compensation Fund; the State Attorney General— far from concluding that Sheets had been "exonerated" and was entitled to the money—refused to return it. The court action left open the possibility that Sheets could be retried, and the Attorney General did "not believe the reversal on the ground of improper admission of evidence

. . . is a favorable disposition of charges," Neb. Op. Atty. Gen. No. 01036 (Nov. 9), 2001 WL 1503144, *3.

In its inflation of the word "exoneration," the Gross article hardly stands alone; mischaracterization of reversible error as actual innocence is endemic in abolitionist rhetoric, and other prominent catalogues of "innocence" in the death-penalty context suffer from the same defect. Perhaps the best-known of them is the List of Those Freed From Death Row, maintained by the Death Penalty Information Center. See http://www. deathpenaltyinfo.org/article.php?scid=6&did=110. This includes the cases from the Gross article described above, but also enters some dubious candidates of its own. Delbert Tibbs is one of them. We considered his case in *Tibbs* v. *Florida,* 457 U. S. 31 (1982), concluding that the Double Jeopardy Clause does not bar a retrial when a conviction is "revers[ed] based on the weight, rather than the sufficiency, of the evidence," *id.*, at 32. The case involved a man and a woman hitchhiking together in Florida. A driver who picked them up sodomized and raped the woman, and killed her boyfriend. She eventually escaped and positively identified Tibbs. See *id.*, at 32–33. The Florida Supreme Court reversed the conviction on a 4-to-3 vote. 337 So. 2d 788 (1976). The Florida courts then grappled with whether Tibbs could be retried without violating the Double Jeopardy Clause. The Florida Supreme Court determined not only that there was no double-jeopardy problem, 397 So. 2d 1120, 1127 (1981) *(per curiam),* but that the *very basis on which it had reversed the conviction was no longer valid law*, *id.*, at 1125, and that its action in "reweigh[ing] the evidence" in Tibbs' case had been "clearly improper," *id.*, at 1126. After we affirmed the Florida Supreme Court, however, the State felt compelled to drop the charges. The State Attorney explained this to the Florida Commission on Capital Cases: "'By the time of the retrial, [the] witness/victim . . . had

progressed from a marijuana smoker to a crack user and I could not put her up on the stand, so I declined to prosecute. Tibbs, in my opinion, was never an innocent man wrongfully accused. He was a lucky human being. He was guilty, he was lucky and now he is free. His 1974 conviction was not a miscarriage of justice.'" Florida Commission on Capital Cases, Case Histories: A Review of 24 Individuals Released From Death Row 136–137 (rev. Sept. 10, 2002) http://www.floridacapitalcases.state.fl.us/ Publications/innocentsproject.pdf. Other state officials involved made similar points. *Id.*, at 137.

Of course, even with its distorted concept of what constitutes "exoneration," the claims of the Gross article are fairly modest: Between 1989 and 2003, the authors identify 340 "exonerations" *nationwide*—not just for capital cases, mind you, nor even just for murder convictions, but for various felonies. Gross 529. Joshua Marquis, a district attorney in Oregon, recently responded to this article as follows:

> "[L]et's give the professor the benefit of the doubt: let's assume that he understated the number of innocents by roughly a factor of 10, that instead of 340 there were 4,000 people in prison who weren't involved in the crime in any way. During that same 15 years, there were more than 15 million felony convictions across the country. That would make the error rate .027 percent—or, to put it another way, a success rate of 99.973 percent." The Innocent and the Shammed, N. Y. Times, Jan. 26, 2006, p. A23.

The dissent's suggestion that capital defendants are *especially* liable to suffer from the lack of 100% perfection in our criminal justice system is implausible. Capital cases are given especially close scrutiny at every level, which is why in most cases many years elapse before the sentence is executed. And of course capital cases receive special

attention in the application of executive clemency. Indeed, one of the arguments made by abolitionists is that the process of finally completing all the appeals and reexaminations of capital sentences is so lengthy, and thus so expensive for the State, that the game is not worth the candle. The proof of the pudding, of course, is that as far as anyone can determine (and many are looking), *none* of cases included in the .027% error rate for American verdicts involved a capital defendant erroneously executed.

Since 1976 there have been approximately a half million murders in the United States. In that time, 7,000 murderers have been sentenced to death; about 950 of them have been executed; and about 3,700 inmates are currently on death row. See Marquis, The Myth of Innocence, 95 J. Crim. L. & C. 501, 518 (2006). As a consequence of the sensitivity of the criminal justice system to the due-process rights of defendants sentenced to death, almost two-thirds of all death sentences are overturned. See *ibid.* "Virtually none" of these reversals, however, are attributable to a defendant's "'actual innocence.'" *Ibid.* Most are based on legal errors that have little or nothing to do with guilt. See *id.*, at 519–520. The studies cited by the dissent demonstrate nothing more.

Like other human institutions, courts and juries are not perfect. One cannot have a system of criminal punishment without accepting the possibility that someone will be punished mistakenly. That is a truism, not a revelation. But with regard to the punishment of death in the current American system, that possibility has been reduced to an insignificant minimum. This explains why those ideologically driven to ferret out and proclaim a mistaken modern execution have not a single verifiable case to point to, whereas it is easy as pie to identify plainly guilty murderers who have been set free. The American people have determined that the good to be derived from capital punishment—in deterrence, and perhaps most of

all in the meting out of condign justice for horrible crimes—outweighs the risk of error. It is no proper part of the business of this Court, or of its Justices, to second-guess that judgment, much less to impugn it before the world, and less still to frustrate it by imposing judicially invented obstacles to its execution.

# SUPREME COURT OF THE UNITED STATES

No. 04–1170

KANSAS, PETITIONER *v.* MICHAEL LEE MARSH, II

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[June 26, 2006]

JUSTICE STEVENS, dissenting.

Having joined Justice Blackmun's dissent from the plurality's opinion in *Walton* v. *Arizona,* 497 U. S. 639, 649–652 (1990), I necessarily also subscribe to the views expressed by JUSTICE SOUTER today. I write separately for two reasons: to explain why agreement with Justice Blackmun's dissent is fully consistent with refusing to read *Walton* as "control[ling]," but see *ante,* at 5 (opinion of the Court), and to explain why the grant of certiorari in this case was a misuse of our discretion.

Under Justice Blackmun's understanding of Arizona law, *Walton* did present exactly the same issue before us today. The Arizona statute at issue required the judge to impose death upon finding aggravating factors if "'there are no mitigating circumstances sufficiently substantial to call for leniency.'" 497 U. S., at 644 (quoting Ariz. Rev. Stat. Ann. §13–703(E) (West 1989)). In Justice Blackmun's view, Arizona case law indicated "that a defendant's mitigating evidence will be deemed 'sufficiently substantial to call for leniency' only if the mitigating factors 'outweigh' those in aggravation." 497 U. S., at 687. Accordingly, Justice Blackmun believed that we confronted the constitutionality of a statute that mandated death when the scales were evenly balanced. *Ibid.*

But Justice Blackmun never concluded that the plurality similarly read Arizona case law as "requir[ing] a capital sentence in a case where aggravating and mitigating

circumstances are evenly balanced." *Id.,* at 688. To the contrary, he observed that "the plurality does not even acknowledge that this is the dispositive question." *Ibid.* Because Justice Blackmun did not read the plurality opinion as confronting the problem of equipoise that he believed Arizona law to present, my join of his dissent is consistent with my conclusion that *stare decisis* does not bind us today. As JUSTICE SOUTER explains, *post*, at 2, n. 1, the *Walton* plurality painstakingly avoided an express endorsement of a rule that allows a prosecutor to argue, and allows a judge to instruct the jury, that if the scales are evenly balanced when the choice is between life and death, the law requires the more severe penalty.

There is a further difference between this case and *Walton*—one that should have kept us from granting certiorari in the first place. In *Walton*, the defendant petitioned for certiorari, and our grant enabled us to consider whether the Arizona Supreme Court had adequately protected his rights under the Federal Constitution. In this case, by contrast, the State of Kansas petitioned us to review a ruling of its own Supreme Court on the grounds that the Kansas court had granted more protection to a Kansas litigant than the Federal Constitution required. A policy of judicial restraint would allow the highest court of the State to be the final decisionmaker in a case of this kind. See *Brigham City* v. *Stuart*, 547 U. S. __, __ (2006) (STEVENS, J., concurring) (slip op., at 3).

There is a remarkable similarity between the decision to grant certiorari in this case and our comparable decision in *California* v. *Ramos,* 463 U. S. 992 (1983). In *Ramos,* we reviewed a decision of the California Supreme Court that had invalidated a standard jury instruction concerning the Governor's power to commute life without parole sentences—an instruction that was unique to California. By a vote of 5 to 4, the Court reversed the judgment of the state court, concluding—somewhat ironically—that "the

wisdom of the decision to permit juror consideration of possible commutation is best left to the States." *Id.,* at 1014.

In response I asked, as I do again today, "what harm would have been done to the administration of justice by state courts if the [Kansas] court had been left undisturbed in its determination[?]" *Id.,* at 1030. "If it were true that this instruction may make the difference between life and death in a case in which the scales are otherwise evenly balanced, that is a reason why the instruction should not be given—not a reason for giving it." *Ibid.* "No matter how trivial the impact of the instruction may be, it is fundamentally wrong for the presiding judge at the trial—who should personify the evenhanded administration of justice—to tell the jury, indirectly to be sure, that doubt concerning the proper penalty should be resolved in favor of [death]." *Ibid.*

As in *Ramos,* in this case "no rule of law commanded the Court to grant certiorari." *Id.,* at 1031. Furthermore, "[n]o other State would have been required to follow the [Kansas] precedent if it had been permitted to stand. Nothing more than an interest in facilitating the imposition of the death penalty in [Kansas] justified this Court's exercise of its discretion to review the judgment of the [Kansas] Supreme Court." *Ibid.* And "[t]hat interest, in my opinion, is not sufficient to warrant this Court's review of the validity of a jury instruction when the wisdom of giving that instruction is plainly a matter that is best left to the States." *Ibid.**

————————

*JUSTICE SCALIA takes issue with my approach, suggesting that the federal interests vindicated by our review are equally weighty whether the state court found for the defendant or for the State. *Ante*, at 2–5 (concurring opinion). In so doing, he overlooks the separate federal interest in ensuring that no person be convicted or sentenced in violation of the Federal Constitution—an interest entirely absent when the State is the petitioner. It is appropriate—and certainly impartial, but

We decided *Ramos* on the same day as *Michigan* v. *Long,* 463 U. S. 1032 (1983). Prior to that time, "we had virtually no interest" in criminal cases where States sought to set aside the rulings of their own courts. *Id.,* at 1069 (STEVENS, J., dissenting). Although in recent years the trend has been otherwise, I continue to hope "that a future Court will recognize the error of this allocation of resources," *id.,* at 1070, and return to our older and better practice of restraint.

_____

see *ante*, at 4–5—to take this difference in federal interests into account in considering whether to grant a petition for writ of certiorari.

JUSTICE SCALIA also fails to explain why there is such an urgent need "to ensure the integrity and uniformity of federal law." *Ante*, at 2. If this perceived need is a "primary basis for the Constitution's allowing us to be accorded jurisdiction to review state-court decisions," *ibid.* (citing Art. III, §2, cls. 1 and 2), then one would think that the First Judiciary Act would have given us jurisdiction to review all decisions based on the Federal Constitution coming out of state courts. But it did not. Unconcerned about JUSTICE SCALIA's "crazy quilt," *ante*, at 4, the First Congress only provided us with jurisdiction over such cases "where [there] is drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of their being repugnant to the constitution, treaties or laws of the United States, *and the decision is in favour of such their validity*." Act of Sept. 24, 1789, §25, 1 Stat. 85 (emphasis added). Not until 1914 did we have jurisdiction over decisions from state courts which arguably overprotected federal constitutional rights at the expense of state laws. Act of Dec. 23, 1914, ch. 2, 38 Stat. 790; see also *Delaware* v. *Van Arsdall,* 475 U. S. 673, 694–697 (1986) (STEVENS, J., dissenting). Even then, our review was only by writ of certiorari, whereas until 1988 defendants had a right to *appeal* to us in cases in which state courts had upheld the validity of state statutes challenged on federal constitutional grounds. See 28 U. S. C. §1257 (1982 ed.). In other words, during the entire period between 1789 and 1988, the laws enacted by Congress placed greater weight on the vindication of federal rights than on the interest in the uniformity of federal law.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–1170

_____

## KANSAS, PETITIONER *v.* MICHAEL LEE MARSH, II

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[June 26, 2006]

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

I

Kansas's capital sentencing statute provides that a defendant "shall be sentenced to death" if, by unanimous vote, "the jury finds beyond a reasonable doubt that one or more aggravating circumstances . . . exist and . . . that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist." Kan. Stat. Ann. §21–4624(e) (1995). The Supreme Court of Kansas has read this provision to require imposition of the death penalty "[i]n the event of equipoise, [that is,] the jury's determination that the balance of any aggravating circumstances and any mitigating circumstances weighed equal." 278 Kan. 520, 534, 102 P. 3d 445, 457 (2004) (case below); see also *State* v. *Kleypas,* 272 Kan. 894, 1016, 40 P. 3d 139, 232 (2001) (stating that the language of §21–4624(e) "provides that in doubtful cases the jury must return a sentence of death"). Given this construction, the state court held the law unconstitutional on the ground that the Eighth Amendment requires that a "'tie g[o] to the defendant' when life or death is at issue." *Ibid.* Because I agree with the Kansas judges that the Constitution forbids a mandatory death penalty in what they describe as "doubtful cases," when aggravating and mitigating factors are of equal weight, I

respectfully dissent.[1]

## II

More than 30 years ago, this Court explained that the Eighth Amendment's guarantee against cruel and unusual punishment barred imposition of the death penalty under statutory schemes so inarticulate that sentencing discretion produced wanton and freakish results. See *Furman* v. *Georgia,* 408 U. S. 238, 309–310 (1972) *(per curiam)* (Stewart, J., concurring) ("[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed" on a "capriciously selected random handful" of individuals). The Constitution was held to require, instead, a system structured to produce reliable, *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion), rational, *Jurek* v. *Texas,* 428 U. S. 262, 276 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), and rationally reviewable, *Woodson, supra*, at 303, determinations of sentence.

Decades of back-and-forth between legislative experiment and judicial review have made it plain that the constitutional demand for rationality goes beyond the minimal requirement to replace unbounded discretion with a sentencing structure; a State has much leeway in devising such a structure and in selecting the terms for measuring relative culpability, but a system must meet an ultimate test of constitutional reliability in producing "'a

---

[1] The majority views *Walton* v. *Arizona,* 497 U. S. 639 (1990), as having decided this issue. But *Walton* is ambiguous on this point; while the Court there approved Arizona's practice of placing the burden on capital defendants to prove, "by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency," *id.,* at 649 (plurality opinion), it did not quantify the phrase "sufficiently substantial." Justice Blackmun clearly thought otherwise, see *id.,* at 687 (dissenting opinion), but he cried a greater foul than one can get from the majority opinion. *Stare decisis* does not control this case.

reasoned moral response to the defendant's background, character, and crime,'" *Penry* v. *Lynaugh,* 492 U. S. 302, 319 (1989) (quoting *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'Connor, J., concurring); emphasis deleted); cf. *Gregg* v. *Georgia,* 428 U. S. 153, 206 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (sanctioning sentencing procedures that "focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant"). The Eighth Amendment, that is, demands both form and substance, both a system for decision and one geared to produce morally justifiable results.

The State thinks its scheme is beyond questioning, whether as to form or substance, for it sees the tie-breaker law as equivalent to the provisions examined in *Blystone* v. *Pennsylvania,* 494 U. S. 299 (1990), and *Boyde* v. *California,* 494 U. S. 370 (1990), where we approved statutes that required a death sentence upon a jury finding that aggravating circumstances outweighed mitigating ones. But the crucial fact in those systems was the predominance of the aggravators, and our recognition of the moral rationality of a mandatory capital sentence based on that finding is no authority for giving States free rein to select a different conclusion that will dictate death.

Instead, the constitutional demand for a reasoned moral response requires the state statute to satisfy two criteria that speak to the issue before us now, one governing the character of sentencing evidence, and one going to the substantive justification needed for a death sentence. As to the first, there is an obligation in each case to inform the jury's choice of sentence with evidence about the crime as actually committed and about the specific individual who committed it. See *Spaziano* v. *Florida,* 468 U. S. 447, 460, and n. 7 (1984). Since the sentencing choice is, by definition, the attribution of particular culpability to a criminal act and defendant, as distinct from the general

culpability necessarily implicated by committing a given offense, see *Penry, supra*, at 327–328; *Spaziano, supra,* at 460; *Zant* v. *Stephens,* 462 U. S. 862, 879 (1983), the sentencing decision must turn on the uniqueness of the individual defendant and on the details of the crime, to which any resulting choice of death must be "directly" related. *Penry, supra,* at 319.

Second, there is the point to which the particulars of crime and criminal are relevant: within the category of capital crimes, the death penalty must be reserved for "the worst of the worst." See, *e.g., Roper* v. *Simmons,* 543 U. S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution'" (quoting *Atkins* v. *Virginia,* 536 U. S. 304, 319 (2002))). One object of the structured sentencing proceeding required in the aftermath of *Furman* is to eliminate the risk that a death sentence will be imposed in spite of facts calling for a lesser penalty, *Penry, supra*, at 328–329, and the essence of the sentencing authority's responsibility is to determine whether the response to the crime and defendant "must be death," *Spaziano, supra*, at 461; cf. *Gregg, supra,* at 184 (joint opinion of Stewart, Powell, and STEVENS, JJ.). Of course, in the moral world of those who reject capital punishment in principle, a death sentence can never be a moral imperative. The point, however, is that within our legal and moral system, which allows a place for the death penalty, "must be death" does not mean "may be death."

Since a valid capital sentence thus requires a choice based upon unique particulars identifying the crime and its perpetrator as heinous to the point of demanding death even within the class of potentially capital offenses, the State's provision for a tie breaker in favor of death fails on both counts. The dispositive fact under the tie breaker is not the details of the crime or the unique identity of the

individual defendant. The determining fact is not directly linked to a particular crime or particular criminal at all; the law operates merely on a jury's finding of equipoise in the State's own selected considerations for and against death. Nor does the tie breaker identify the worst of the worst, or even purport to reflect any evidentiary showing that death must be the reasoned moral response; it does the opposite. The statute produces a death sentence exactly when a sentencing impasse demonstrates as a matter of law that the jury does not see the evidence as showing the worst sort of crime committed by the worst sort of criminal, in a combination heinous enough to demand death. It operates, that is, when a jury has applied the State's chosen standards of culpability and mitigation and reached nothing more than what the Supreme Court of Kansas calls a "tie," *Kleypas,* 272 Kan., at 1016, 40 P. 3d, at 232 (internal quotation marks omitted). It mandates death in what that court identifies as "doubtful cases," *ibid.* The statute thus addresses the risk of a morally unjustifiable death sentence, not by minimizing it as precedent unmistakably requires, but by guaranteeing that in equipoise cases the risk will be realized, by "placing a 'thumb [on] death's side of the scale,'" *Sochor* v. *Florida,* 504 U. S. 527, 532 (1992) (quoting *Stringer* v. *Black,* 503 U. S. 222, 232 (1992); alteration in original).

In Kansas, when a jury applies the State's own standards of relative culpability and cannot decide that a defendant is among the most culpable, the state law says that equivocal evidence is good enough and the defendant must die. A law that requires execution when the case for aggravation has failed to convince the sentencing jury is morally absurd, and the Court's holding that the Constitution tolerates this moral irrationality defies decades of precedent aimed at eliminating freakish capital sentencing in the United States.

## III

That precedent, demanding reasoned moral judgment, developed in response to facts that could not be ignored, the kaleidoscope of life and death verdicts that made no sense in fact or morality in the random sentencing before *Furman* was decided in 1972. See 408 U. S*.,* at 309–310 (Stewart, J., concurring). Today, a new body of fact must be accounted for in deciding what, in practical terms, the Eighth Amendment guarantees should tolerate, for the period starting in 1989 has seen repeated exonerations of convicts under death sentences, in numbers never imagined before the development of DNA tests. We cannot face up to these facts and still hold that the guarantee of morally justifiable sentencing is hollow enough to allow maximizing death sentences, by requiring them when juries fail to find the worst degree of culpability: when, by a State's own standards and a State's own characterization, the case for death is "doubtful."

A few numbers from a growing literature will give a sense of the reality that must be addressed. When the Governor of Illinois imposed a moratorium on executions in 2000, 13 prisoners under death sentences had been released since 1977 after a number of them were shown to be innocent, as described in a report which used their examples to illustrate a theme common to all 13, of "relatively little solid evidence connecting the charged defendants to the crimes." State of Illinois, G. Ryan, Governor, Report of the Governor's Commission on Capital Punishment: Recommendations Only 7 (Apr. 2002) (hereinafter Report); see also *id.,* at 5–6, 7–9. During the same period, 12 condemned convicts had been executed. Subsequently the Governor determined that 4 more death row inmates were innocent. See *id.,* at 5–6; Warden, Illinois Death Penalty Reform, 95 J. Crim. L. & C. 381, 382, and n. 6

(2005).[2]  Illinois had thus wrongly convicted and con-
demned even more capital defendants than it had exe-
cuted, but it may well not have been otherwise unique; one
recent study reports that between 1989 and 2003, 74
American prisoners condemned to death were exonerated,
Gross, Jacoby, Matheson, Montgomery, & Patil, Exonera-
tions in the United States 1989 Through 2003, 95 J. Crim.
L. & C. 523, 531 (2006) (hereinafter Gross), many of them

———————

[2] The Illinois Report emphasizes the difference between exoneration
of a convict because of actual innocence, and reversal of a judgment
because of legal error affecting conviction or sentence but not inconsis-
tent with guilt in fact.  See Report 9 (noting that, apart from the 13
released men, a "broader review" discloses that more than half of the
State's death penalty cases "were reversed at some point in the proc-
ess").  More importantly, it takes only a cursory reading of the Report
to recognize that it describes men released who were demonstrably
innocent or convicted on grossly unreliable evidence.  Of one, the Report
notes "two other persons were subsequently convicted in Wisconsin of"
the murders.  *Id.,* at 8.  Of two others, the Report states that they were
released after "DNA tests revealed that none of them were the source of
the semen found in the victim.  That same year, two other men con-
fessed to the crime, pleaded guilty and were sentenced to life in prison,
and a third was tried and convicted for the crime."  *Ibid.*  Of yet an-
other, the Report says that "another man subsequently confessed to the
crime for which [the released man] was convicted.  He entered a plea of
guilty and is currently serving a prison term for that crime."  *Id.,* at 9.

A number were subject to judgments as close to innocence as any
judgments courts normally render.  In the case of one of the released
men, the Supreme Court of Illinois found the evidence insufficient to
support his conviction.  See *People* v. *Smith,* 185 Ill. 2d 532, 708 N. E.
2d 365 (1999).  Several others obtained acquittals, and still more simply
had the charges against them dropped, after receiving orders for new
trials.

At least 2 of the 13 were released at the initiative of the executive.
We can reasonably assume that a State under no obligation to do so
would not release into the public a person against whom it had a valid
conviction and sentence unless it were certain beyond all doubt that the
person in custody was not the perpetrator of the crime.  The reason that
the State would forgo even a judicial forum in which defendants would
demonstrate grounds for vacating their convictions is a matter of
common sense: evidence going to innocence was conclusive.

cleared by DNA evidence, *ibid.*[3]  Another report states that "more than 110" death row prisoners have been released since 1973 upon findings that they were innocent of the crimes charged, and "[h]undreds of additional wrongful convictions in potentially capital cases have been documented over the past century."  Lanier & Acker, Capital Punishment, the Moratorium Movement, and Empirical Questions, 10 Psychology, Public Policy & Law 577, 593 (2004).  Most of these wrongful convictions and sentences resulted from eyewitness misidentification, false confession, and (most frequently) perjury, Gross 544, 551–552, and the total shows that among all prosecutions homicide cases suffer an unusually high incidence of false conviction, *id.,* at 532, 552, probably owing to the combined difficulty of investigating without help from the victim, intense pressure to get convictions in homicide cases, and the corresponding incentive for the guilty to frame the

—————

[3] The authors state the criteria for their study: "As we use the term, 'exoneration' is an official act declaring a defendant not guilty of a crime for which he or she had previously been convicted.  The exonerations we have studied occurred in four ways: (1) In forty-two cases governors (or other appropriate executive officers) issued pardons based on evidence of the defendants' innocence.  (2) In 263 cases criminal charges were dismissed by courts after new evidence of innocence emerged, such as DNA.  (3) In thirty-one cases the defendants were acquitted at a retrial on the basis of evidence that they had no role in the crimes for which they were originally convicted.  (4) In four cases, states posthumously acknowledged the innocence of defendants who had already died in prison . . . ."  Gross 524 (footnote omitted).  The authors exclude from their list of exonerations "any case in which a dismissal or an acquittal appears to have been based on a decision that while the defendant was not guilty of the charges in the original conviction, he did play a role in the crime and may be guilty of some lesser crime that is based on the same conduct.  For our purposes, a defendant who is acquitted of murder on retrial, but convicted of involuntary manslaughter, has not been exonerated.  We have also excluded any case in which a dismissal was entered in the absence of strong evidence of factual innocence, or in which—despite such evidence—there was unexplained physical evidence of the defendant's guilt."  *Ibid.*, n. 4.

innocent, *id.,* at 532.

We are thus in a period of new empirical argument about how "death is different," *Gregg,* 428 U. S., at 188 (joint opinion of Stewart, Powell, and STEVENS, JJ.): not only would these false verdicts defy correction after the fatal moment, the Illinois experience shows them to be remarkable in number, and they are probably disproportionately high in capital cases. While it is far too soon for any generalization about the soundness of capital sentencing across the country, the cautionary lesson of recent experience addresses the tie-breaking potential of the Kansas statute: the same risks of falsity that infect proof of guilt raise questions about sentences, when the circumstances of the crime are aggravating factors and bear on predictions of future dangerousness.

In the face of evidence of the hazards of capital prosecution, maintaining a sentencing system mandating death when the sentencer finds the evidence pro and con to be in equipoise is obtuse by any moral or social measure. And unless application of the Eighth Amendment no longer calls for reasoned moral judgment in substance as well as form, the Kansas law is unconstitutional.